**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Government, | § | |
| | § | |
| | § | |
| VS. | § | CRIMINAL  NO. H-03-238 |
| | § | |
| | § | |
| PETE JOE VILLEGAS, | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Defendant Pete Joe Villegas is charged in a two-count indictment of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and with possessing a firearm considered a destructive device, in violation of 26 U.S.C. §§ 5861(d) and 5871.  (Docket Entry 1).  The weapons that serve as the basis of the charges were discovered during the execution of a parole warrant authorizing Villegas's arrest for violating his parole conditions.  The parole warrant issued pursuant to Texas Government Code §§ 508.251 and 508.252(4).  Pending before this court are two motions to suppress evidence obtained during execution of the parole warrant on April 29, 2003.  (Docket Entries 145, 158).  This court denies both motions for the reasons discussed below.

**I. BACKGROUND**

At the time of the alleged events, Villegas was on parole from Texas prison.  On March 27, 2003, Houston Police Officer Michael Zientek responded to a report of a stolen gun.  (1 Tr. 14).  The complainant, Diane Broxson, told Zientek that either Villegas or John

Nevarez had stolen her gun.  (*Id.* at 16-17).  After further discussion, Broxson also reported that Villegas was in possession of firearms, including an AK-47 and a "street sweeper," stolen property, and illegal narcotics.  (*Id.* at 17-18).  Officer Zientek prepared a police report based on Broxson's statements to him and informed Sergeant Copeland of the information. (*Id.* at 27-28).

Sergeant Copeland then turned the report over to Officer Phillip Galloway of the Texas Department of Criminal Justice Division, whose job includes work with the Board of Pardons and Paroles.  (1 Tr. at 30-31).  After reviewing Zientek's report, Officer Galloway reviewed Villegas's criminal history and spoke to Villegas's parole officer, Officer Epie. (*Id.* at 32-33).  On April 10, 2003, as part of his investigation, Galloway asked Sergeant Copeland to call Eastland Plumbing, which Villegas had listed as his employer on his parole information form, to verify Villegas's employment.  (*Id.* at 35; Ex. 3).  Copeland reported that the owner of the business had not seen Villegas for several years.  (1 Tr. 35-36).  The next day, April 11, 2002, Galloway received a supplemental police report stating that Diane Broxson had committed suicide.  (*Id.* at 36-37).  Galloway called Houston Police Officer Sandra Pudifin, who investigated the suicide, and learned that Broxson had used the gun she had reported as stolen.  (*Id.* at 37).  Based on her own interview of Broxson, Pudifin reiterated Broxson's earlier complaint that Villegas had assault weapons and a bulletproof vest in his possession.  (1 Tr. 38-39; 2 Tr. 56).

Galloway continued his investigation by going to 703H Timberline, the address given in the initial police report as Villegas's residence.  He also went to the address Villegas had

reported on his parole documents, 16406 Mango Ridge. (1 Tr. 38; Ex. 3). The Timberline address had cars registered to Villegas; the address Villegas reported looked abandoned. (1 Tr. 39-40). Over "several weeks," Officer Galloway continued to monitor both addresses. Officer Galloway credibly testified that throughout this period everything he observed indicated that Villegas was not living at Mango Ridge as he told the Parole Board, but at 703H Timberline, as Broxson had told two police officers in separate interviews. (*Id.* at 40).

On April 16, 2003, Officer Galloway reported this information to Officer Epie. (*Id.*). Epie was "shocked" because Galloway's information indicated that Villegas had violated several conditions of his parole: reporting false employment information; reporting a false residence address; and possessing illegal weapons. Before this time, Epie had not had any problems as Villegas's parole officer. (*Id.* at 40-41). Officer Epie called Eastland Plumbing, which had been faxing her employment information for Villegas, and determined that the information she had been receiving was false. (*Id.* at 41). Epie found similarly suspicious the information about Villegas's reported address. (*Id.*). At this point, Officer Galloway shared with Officer Epie his informed belief that Villegas was residing at 703H Timberline and that the guns and bulletproof vest described in the prior police reports were likely to be found in that location. (*Id.* at 42). Officer Galloway credibly testified that he found the information contained in the report from Broxson and Officer Pudifin to be reliable. (*Id.*).

Officer Galloway continued surveillance on the Timberline residence. (*Id.* at 42-43). On April 25, 2003, Officer Galloway spoke with Officer Epie about going to Epie's supervisor and obtaining a parole revocation warrant for the Timberline address. (*Id.* at 43).

Additionally, as Galloway's surveillance continued, Galloway saw Villegas at the Timberline residence on April 28 between 5:00 and 5:15 pm.  (*Id.* at 44).

After conferring with Officer Galloway, Officer Epie requested issuance of a parole revocation warrant.  (Ex. 4; 2 Tr. 12-13).  Officer Epie based her request on the police report, which is a common practice.  (2 Tr. 16).  Specifically, Officer Epie stated that, according to Officer Galloway and the police report, Villegas  had "under his possession several assault weapons, sweeper, AK47, among others."  (Ex. 4, 4).  A parole revocation warrant was issued on April 26, 2003.  Officer Galloway learned of the warrant's issuance on Monday, April 28, 2003.  (1 Tr. 45).

On April 29, 2003, Officer Galloway and several other officers, including Officer Pudifin and Sergeant Copeland, executed the parole revocation warrant at 703H Timberline. (1 Tr. 46).  After Officer Galloway knocked on the door and announced the presence of the police, Jesse Nevarez opened the door and the officers entered.  (*Id.* at 48).  Nevarez stated that Villegas was upstairs.  (*Id.* at 49).  As the officers went upstairs, Nevarez shouted, "Pete! Pete!", which Officer Galloway considered a warning that put the officers in danger.  (*Id.* at 49-50).  Officer Galloway credibly testified about his concern that the officers could be "ambushed" going up the stairs.  (*Id.* at 50).  At the top of the stairs, Galloway noticed a bathroom with an open door, a bedroom to the right of the bathroom with an open door, and two other bedrooms at the end of the hallway to the left.  One of the bedrooms had an open door, and the other had the door closed.  (*Id.* at 51).  Galloway called Villegas's name outside the closed door; Villegas answered; and Galloway opened the door to find Villegas sitting

on the edge of the bed. A woman was in the bed. (*Id.* at 52). Villegas was getting up from the bed as the officers entered the room and had begun walking towards the door. (*Id.*). Galloway forced Villegas down to the floor. (*Id.* at 52-53). As he was being restrained, Villegas reached for an open, black bag. (*Id.* at 53; 2 Tr. 27). Officer Galloway grabbed the bag to prevent Villegas from reaching it. While pulling Villegas's hand away from the open bag and moving it away from Villegas, Officer Galloway glanced inside the bag, immediately identified a weapon, and yelled, "Gun!" (1 Tr. 53). Sergeant Copeland and Officer Galloway both testified as to the contents of the bag, which indeed contained a gun. (*Id.*; 2 Tr. 28).

Other officers restrained Villegas and Officer Galloway left the room. Still inside the bedroom with Villegas, Sergeant Copeland patted down the bed to make sure it did not hide additional weapons. (2 Tr. 28). Copeland felt another gun under a one-inch thick piece of foam on top of the mattress; Copeland secured the weapon. (*Id.*). The officers then passed the woman in the bed her clothes. While this was going on, Copeland observed another green-colored bag between the bed and the wall. (2 Tr. 31). As Copeland walked near the bed to make sure the female was in a secure place, his path was blocked by this large bag. Copeland picked the bag up and put it on the bed. (2 Tr. 33). When Copeland picked up the bag, it felt very heavy and made a loud "metal on metal" clanging sound. (*Id.*). Because the bag was now sitting next to the woman, Copeland opened the bag to make sure it did not contain weapons. (*Id.*). He saw numerous additional weapons inside, including a "street sweeper." (*Id.* at 33-35).

After Galloway entered the hallway, another officer asked him to come into one of the other, open bedrooms.  (1 Tr. 55).  Inside the open closet door of the other bedroom, Officer Galloway saw a rifle that looked like an AK-47.  (*Id.*).  This weapon, along with the others seized from the bedroom, were all taken into custody after being photographed by the officers.  This search is the subject of the instant suppression motions.

This court held a suppression hearing on September 4 and 12, 2003.  (Docket Entries 28, 31).  After hearing testimony from several witnesses and arguments by counsel, the motion to suppress was denied.  After further proceedings, including a mistrial (Docket Entry 104), and changes in counsel, Villegas again filed motions to suppress on May 3, 2005 (Docket Entry 145) and August 12, 2005 (Docket Entry 158).

## II. THE FOURTH AMENDMENT STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  The "reasonableness" of a search is determined from the totality of the circumstances.  *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).  Often the inquiry focuses on whether the law enforcement officials conducting the search first demonstrated probable cause to a neutral magistrate and obtained a warrant.  An individual on parole does not enjoy the same privacy rights.  *See United States v. Knights*, 534 U.S. 112, 119 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987).  The government has a legitimate interest in monitoring parolees with vigilance.  *See Knights*, 534 U.S. at 119 (citing *Griffin*, *supra*, and *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).  Recognizing the intersection of parole and

the Fourth Amendment's requirements, the Supreme Court requires that an officer demonstrate "no more than reasonable suspicion to conduct a search of [a] probationer's house."[1] *Knights*, 534 U.S. at 121.  The Fifth Circuit has read *Knights* broadly, holding that neither a written condition of probation nor an explicit regulation is required to permit a search of a parolee's home so long as the officer has "reasonable suspicion" that illegal activity is afoot.  *United States v. Keith*, 375 F.3d 346, 350 (5th Cir. 2004).

## III. DEFENDANT'S MOTIONS

### A. May 3, 2005 Motion to Suppress

Villegas contends that Officer Galloway improperly used Officer Epie and the parole revocation warrant process as an end-run around the higher standards that would have attached had the officers searched Villegas's premises under an ordinary search warrant. According to Villegas, Officer Galloway turned to this pretextual means of obtaining a warrant after Galloway's initial informant, Broxson, committed suicide.  Villegas analogizes this case to *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), which held that a government-operated hospital violated its patients' rights when it tested pregnant women for drugs and turned over the names of all patients testing positive to the police for prosecution. *Id.* at 76-78, 84.  Villegas contends that Officer Galloway improperly commandeered the parole supervision process to violate Villegas's Fourth Amendment rights.

---

[1] Although Villegas was on parole, not probation, the two terms are interchangeable for constitutional purposes. *See, e.g.*, *Porter v. State*, Nos. 14-01-687-CR, 14-01-688-CR, 2002 WL 1488983, *2 (Tex. App.-Hous. (14th Dist.)) ("Probationers (and parolees) do not enjoy the absolute liberty to which other citizens are entitled." (citing *Knights*)).

Neither the testimony from the suppression hearing nor governing case law support this position.  It is true that Officer Galloway's investigation did not begin with the parole department or Officer Epie.  However, Officer Galloway credibly testified that Officer Zientek learned from Broxson that Villegas had several assault weapons and a bullet-proof vest in his possession.  (1 Tr. 17).  Galloway also contacted Officer Sandra Pudifin of the Houston Police Department and the ATF Violent Crime Initiative Task Force.  (2 R. 54).  Pudifin corroborated much of the initial information, namely that Broxson had reported to her the Villegas was dealing drugs from his residence and possessed assault weapons and a bullet-proof vest.  (1 Tr. 37; 2 Tr. 75).  Galloway reasonably turned to Officer Epie, Villegas's parole officer, for information about Villegas. (1 Tr. 33).  Galloway intended to have Broxson make further inquiries at Pudifin's behest when Pudifin informed him that Broxson had committed suicide.  (2 Tr. 60-61, 80).  Galloway then continued discussions with Officer Epie.  The court finds nothing improper about Galloway's decision to continue to investigate Villegas through a variety of lawful means, including Villegas's parole officer.

This court finds the testimony of Officer Galloway, Officer Pudifin, and Sergeant Copeland credible.  Additionally, this court finds that the information Officer Epie submitted to obtain the parole revocation warrant met the "reasonable suspicion" standard.  The search did not represent an end-run around the Fourth Amendment as Villegas contends.  Rather, the search was a product of multiple layers of investigation from independent sources.  The officers not only had reasonable suspicion, but also probable cause to search the premises on

the morning in question.  The search was reasonable within the meaning of the Fourth Amendment.

### B. August 12, 2005 Motion to Suppress

Villegas reiterates his earlier arguments that (1) the applicable standard to be met is probable cause, and (2)  the officers lacked probable cause to search and arrest Villegas. These arguments fail.

As discussed in Part II, the standard is reasonable suspicion.  *Knights*, 534 U.S. at 122; *Griffin*, 483 U.S. at 870-71.  Officer Galloway had reasonable suspicion to search Villegas's premises at the time based on the information he had received and himself observed.  Villegas had violated the express requirements of his parole before the guns entered the picture by reporting a false home address and false employment information.  Galloway and Officer Epie verified that the information provided was false.  (*See* 1 Tr. 40-44).  Moreover, both Galloway and Epie had a reasonable suspicion that Villegas had weapons on the premises; possessing weapons represented an independent parole violation and properly formed the basis for the parole revocation warrant obtained by Officer Epie.  (*See id.*; Exs. 1, 4).  To the extent Villegas is arguing that the officers needed probable cause to arrest him, that burden is also met.

### IV. CONCLUSION

The parole revocation warrant was valid.  Villegas's motions to suppress are denied.  A final pretrial conference will be held on **September 30, 2005, at 9:00 a.m.**

Jury selection and trial is set for **October 4, 2005, at 9:00 a.m.**

SIGNED on September 1, 2005, at Houston, Texas.

_Lee H. Rosenthal_

_____

Lee H. Rosenthal
United States District Judge